**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**, a non-profit corporation,<br><br>    *Plaintiff,*<br><br>**v.**<br><br>**NATIONAL FOUNDATION FOR RESCUED ANIMALS D/B/A TIGER CREEK ANIMAL SANCTUARY**, a non-profit corporation; **BRIAN WERNER FERRIS**, an individual; & **EMILY OWEN**, an individual,<br><br>    *Defendants.* | Civil Action No. _____ |

**PLAINTIFF ANIMAL LEGAL DEFENSE FUND'S ORIGINAL COMPLAINT AND REQUEST FOR DECLARATORY RELIEF AND PERMANENT INJUNCTION**

Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF" or "Plaintiff"), by and through its attorneys of record, files this, its Original Complaint and Request for Declaratory Relief and Permanent Injunction against Defendants, NATIONAL FOUNDATION FOR RESCUED ANIMALS D/B/A TIGER CREEK ANIMAL SANCTUARY ("Tiger Creek"); BRIAN WERNER FERRIS, as an individual and in his capacity as founder and former director of Tiger Creek; and EMILY OWEN, as an individual and in her capacity as Chairman and Executive Director of Tiger Creek (collectively "Defendants"), and would respectfully show as follows:

## I. NATURE OF THE CASE

1. Over the past five years, at least nine lions and tigers have died at Defendants' "sanctuary" for big cats. Through a careless approach to providing timely and adequate veterinary care, Defendants' actions have eviscerated the big cats' population at Tiger Creek

by a third. Among these deaths are a tiger who laid dying for days in his own waste without any veterinary intervention, a lion with gaping wounds who was forced to endure extensive and painful medical treatments to generate donations until his death, and immobile, dying cats stabbed repeatedly in their chest in a brutal form of euthanasia.

2.      Each death resulted from the haphazard management of Defendants Emily Owen or Brian Werner Ferris, the current and former Tiger Creek Directors who consistently ignored the pleas of dedicated employees seeking care for the injured and ill animals at Tiger Creek. Each death also resulted from Tiger Creek's persistently understaffed operations.

3.      Despite their demonstrated inability to provide timely and adequate veterinary care for the dozens of big cats exhibited at their facility, Defendants have consistently added more animals over the past five years in a quest to generate public attention. The pursuit is without regard for Defendants' ability to care for those animals. This includes two ring-tailed lemurs— a highly social and intelligent species—Defendants acquired with no plan for their care, leaving each to live in bird cages, alone, for years and without a sufficient Animal Welfare Act ("AWA")-mandated enrichment plan to account for their complex psychological needs.

4.      The animals who remain alive—seventeen tigers, two lions, two ring-tailed lemurs, and a number of pumas, servals, and bobcats—suffer from the conditions of their confinement. Defendants' inadequate staffing has caused sparse and randomly-implemented enrichment, unsafe diets, and improper sanitation that has significantly disrupted each animal's normal behavioral patterns. Several animals chewed their tails off from stress and disruptions to their species-specific behaviors that Defendants' conditions of confinement have created.

5.      Defendants' care of the animals contravenes generally-accepted practices for the conditions of captive animals, are contrary to the AWA's terms, and have actually injured,

wounded, and harmed the lions, tigers, ring-tailed lemurs, and members of other endangered or threatened species captive at Tiger Creek. The care has additionally harassed each of these animals by significantly disrupting their normal behavioral patterns. This case challenges these conditions under the Endangered Species Act ("ESA") and seeks to enjoin Defendants from continued violations of the Act.

## II. <u>PARTIES</u>

**PLAINTIFF**

6.      ANIMAL LEGAL DEFENSE FUND is a national non-profit organization headquartered in Cotati, California with over 300,000 members and supporters. ALDF pursues its mission of protecting the lives and advancing the interests of animals by advocating for the protection of endangered and threatened animals. ALDF frequently focuses on animal husbandry practices and the confinement of animals used for entertainment and exhibition purposes. ALDF has expended significant organizational resources on advocacy and public education efforts to improve the welfare of animals—including members of threatened and endangered species—that are held in captivity. ALDF is entitled to bring a citizen suit under the ESA. 16 U.S.C. §§ 1540(g), 1532(13).

7.      ALDF brings this action on behalf of its members pursuant to the citizen-suit provision of the ESA. 16 U.S.C. § 1540(g). Several ALDF members have visited and worked at Tiger Creek, where they observed, had daily interactions with, and developed aesthetic and emotional connections to the animals there, including the tigers, lions, ring-tailed lemurs, pumas, servals, and bobcats. These members became distressed and upset due to the animal mistreatment and suffering that they witnessed. The inhumane and inadequate conditions

prevent ALDF members who worked at Tiger Creek from viewing and enjoying the animals kept there, both during and after their employment at Tiger Creek.

8.      Because ALDF's members appreciate and are attached to the particular animals at Tiger Creek and are concerned about their welfare, they wish to observe the animals in humane conditions and, likewise, are injured by seeing them in inhumane, harmful conditions. If the animals at Tiger Creek were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in humane conditions, ALDF's members would visit the animals. Similarly, if the Court ordered Tiger Creek to improve the conditions in which the animals are kept at Tiger Creek such that the animals are living in safe, humane, and ESA-compliant conditions, then members of ALDF would visit the animals at Tiger Creek without aesthetic injury.

9.      ALDF and its members seek to guard their interests in protecting the lives of and advancing the interests of the endangered and threatened animals located at Tiger Creek. Further, both ALDF and its members have been, and will continue to be, harmed by Defendants' "take," transfer, and other violations of the ESA against the endangered and/or threatened animals through Defendants' operation and management of Tiger Creek. Neither the claims asserted by ALDF, nor the relief it requests, require the participation of its individual members.

**DEFENDANTS**

10.      NATIONAL FOUNDATION FOR RESCUED ANIMALS D/B/A TIGER CREEK ANIMAL SANCTUARY is a 501(c)(3) non-profit organization located at 17552 Farm to Market Road 14, Tyler, Texas 75706. Tiger Creek has its principal place of business in Texas.

11.     BRIAN WERNER FERRIS, in his individual capacity and in his capacity as founder and a former director of Tiger Creek, is, upon information and belief, a citizen and resident of Tyler, Texas.

12.     EMILY OWEN, in her individual capacity and in her capacity as Chairman and Executive Director of Tiger Creek, is, upon information and belief, a citizen and resident of Tyler, Texas.

### III. <u>JURISDICTION & VENUE</u>

13.     The Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this Complaint states claims arising under federal law. Specifically, the Complaint alleges violations of the Endangered Species Act, 16 U.S.C. §§ 1531 *et. seq.*

14.     Pursuant to 28 U.S.C. §§ 2201–02, the Court is authorized to provide declaratory relief. The ESA's citizen-suit provision further authorizes the Court to enjoin violations of the ESA and its implementing regulations. *See* 16 U.S.C. § 1540.

15.     Plaintiff provided Defendants and the Secretary of the Interior ("Secretary") notice of its intent to sue Defendants on January 10, 2022 via email, first class mail, and certified return receipt requested mail at least sixty (60) days in advance of this Complaint, as required by the ESA. 16 U.S.C. § 1540(g)(2)(A)(i); *see also* Exhibit A, a true and correct copy of ALDF's Notice of Intent Letter to Defendants, which is specifically incorporated herein by reference. The violations identified in the Notice Letter continue to occur and are reasonably likely to continue to occur. On information and belief, Defendants have not applied for any permit to lawfully take or transfer interstate members of federally-listed species, nor have Defendants taken any action to remedy or prevent continued violations of the ESA. The

Secretary has not initiated an action to impose a penalty under 16 U.S.C. § 1540(a), and the United States has not taken any action to prevent continued violations of the ESA.

16.     This Court has personal jurisdiction over each of the Defendants because they are each residents of the State of Texas. Defendant Tiger Creek has its principal place of business in Tyler, Texas. Defendants Brian Werner Ferris and Emily Owen are residents of Texas.

17.     Venue of this action in this Court and district is proper pursuant to 28 U.S.C. §§ 1391(b)(1), (2). The Defendants are all residents of the Eastern District of Texas and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. In addition, Plaintiff may bring suit in this judicial district because the violations of the ESA occurred in the Eastern District of Texas. *See* 16 U.S.C. § 1540(g)(3)(A).

## IV. STATUTORY & REGULATORY FRAMEWORK

18.     The ESA protects federally endangered and threatened species in "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978). The ESA establishes a scheme under which any species defined as "endangered" or "threatened" is protected from various private and governmental activities that will or may jeopardize its continued existence.

19.     Agencies implementing the ESA, including the U.S. Fish and Wildlife Service ("FWS"), decide whether to list species as "threatened" or "endangered" under the ESA. *See* 16 U.S.C. § 1533(a). Once a species is designated as such, it receives the ESA's protections. *See Shields v. Norton*, 289 F.3d 832, 834 (5th Cir. 2002).

20.     Section 9 of the ESA prohibits the "take" of any endangered or threatened species. 16 U.S.C. § 1538(a); 50 C.F.R. § 17.31(a). "The ESA expansively defines the term 'take' as 'to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage

in any such conduct.'" *Hill v. Coggins*, 867 F.3d 499, 508 (4th Cir. 2017) (quoting 16 U.S.C. § 1532(19)). Congress intended for "take" to be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 561 (D. Md. 2009) (quoting S. Rep. No. 93-307, at 7 (1973)).

21.     The FWS has issued regulations regarding some of the terms composing the definition of "take." 50 C.F.R. § 17.3. The agency defines "harm" as "an act which actually kills or injures wildlife." *Id.* The agency also defines "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

22.     The ESA's "take" prohibition generally applies to members of listed species living in the wild *and* in captivity. *See, e.g.*, *Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 741 (W.D. Tex. 2017); Proposed Amendment to the Endangered Species Act, 79 Fed. Reg. 4313, 4317 (Jan. 27, 2014) (codified at 50 C.F.R. pt. 224).

23.     The ESA further makes it unlawful for any person to "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any [endangered or threatened] species" absent a valid permit. 16 U.S.C. § 1538(a)(1). The ESA defines "commercial activity" as "all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: [p]rovided, however, [t]hat it does not include exhibition of commodities by museums or similar cultural or historical organizations." 16 U.S.C. §1532(2). In order to engage in transfer activities prohibited by 16

U.S.C. § 1538(a)(1), parties must apply for a permit with the Secretary pursuant to the requirements of 16 U.S.C. § 1539.

24.     Defendants violating the ESA risk civil and criminal penalties. 16 U.S.C. §§ 1540(a)–(b). The ESA allows private parties to bring civil enforcement actions sixty (60) days after providing adequate notice of the violations to both the violator and the Secretary. *Id.* § 1540(g). A court that finds violations of the ESA "take" prohibition has the authority to order the removal and relocation of animals at issue to other, more protective facilities. *Kuehl v. Sellner*, 887 F.3d 845, 854 (8th Cir. 2018).

## V.  <u>FACTUAL BACKGROUND</u>

25.     Tiger Creek is a self-described "sanctuary" located in Tyler, Texas that exhibits dozens of big cats and other animals to members of the public, who pay an admission fee to view them. Tiger Creek also solicits donations from members of the public, but receives a 0 out of 5 charity score from Charity Navigator, an independent charity ranking agency that bases its ranking on charity operations including a charity's accountability and transparency, as well as the health of its finances.

26.     Tiger Creek currently possesses seventeen tigers, two lions, and two ring-tailed lemurs, each of which are listed as "endangered" or "threatened" under the ESA. 50 C.F.R. § 17.11. Tiger Creek additionally possesses pumas, servals, and bobcats believed to be "endangered" or "threatened" under the ESA. 50 C.F.R. § 17.11.

27.     Tiger Creek is known for its big cats—particularly lions and tigers—who are featured as the main attraction of the facility and whose biographies are distributed in books, fundraising emails, and advertising campaigns seeking donations from the public for their care.

28.     Defendants' veterinary care, confinement, husbandry, and exhibition activities injure, wound, harm, harass, and kill the animals at Tiger Creek. They have already caused or contributed to the harassment, injury, wounding, and/or killing of at least nine big cats in the past five years. Defendants' activities are not generally accepted practices, not compliant with the AWA, and are likely to result in injury to the animals it continues to keep.

### Lack of Timely & Adequate Veterinary Care

29.     Over the past five years, Defendants have delayed providing timely and adequate veterinary care to sick and/or injured animals. Animals have frequently suffered and died as a result of Defendants' refusal to authorize timely or appropriate veterinary care for the animals. The denial of timely and adequate veterinary care—including a lack of appropriate and timely palliative care or euthanasia—has led to each of the endangered and threatened animals' harm, wounding, and harassment in a manner likely to cause or that has already caused injury.

30.     For example, in November 2017, a male tiger named Tibor lost consciousness and could no longer move. For 48 hours, Tibor remained immobile in his enclosure, eventually passing away after spending hours in the rain, laying on his side and in his own urine, shaking. Defendants failed to provide Tibor with any veterinary care in the 48 hours he laid immobile up to his death.

31.     In early 2018, a tiger named Lexie became ill and experienced a decline in her mobility. Eventually, Lexie was observed laying on her side and began urinating where she lay. Her prolonged immobility in urine-soaked hay caused wounds to fester on her legs. Lexie received no veterinary care for her condition until approximately a week before her death.

32.     Scrunches, a geriatric female lion, developed mobility issues in October 2018 that were brought to the attention of Tiger Creek. By December 2018, she had to be hand-fed. No

veterinarian was called to examine Scrunches until her euthanasia, which occurred at the end of January 2019. She was euthanized only after she was seen dragging her back legs around her enclosure, unable to walk.

33.     In July 2018, a male tiger named Greg began to have sandy feces and was observed licking the sand in his enclosure. Despite Defendants knowing that his health was abnormal, no veterinary care was arranged until September 2018, only after he developed a distended abdomen and had refused food for several weeks. Greg was euthanized on October 2, 2018.

34.     In June 2019, keepers first observed that a tiger named Kumari was showing signs of illness, including a swollen abdominal area. Kumari did not receive any veterinary care for at least two months. On September 19, 2019, Tiger Creek staff observed Kumari eating dirt. By this time, her abdomen had doubled in size. At that point, Defendants finally brought Kumari in for an ultrasound. On September 24, 2019, Kumari underwent an ovariohysterectomy. Immediately after surgery, Defendants left Kumari in her transfer crate in the maintenance building for over twelve hours. Kumari died, still locked inside her transfer cage, waiting to be put back in her enclosure.

35.     In late 2019, Defendants moved a serval named Simba to a small, off-exhibit enclosure. Shortly after, Simba stopped eating and appeared lethargic. Defendants refused to allow Simba to be seen by a veterinarian. Simba spent the next two days vomiting and was observed over the proceeding days as appearing severely dehydrated and largely immobile. Upon information and belief, Simba eventually died without veterinary intervention. On information and belief, Defendants failed to provide Simba with timely and appropriate veterinary care, resulting in his injury and ultimately his death.

36.     These examples are just some of the endangered or threatened animals harmed, wounded, harassed, and killed by Defendants' denial of timely and adequate veterinary care.

37.     In addition, Defendants have failed to provide veterinary care by a veterinarian with expertise in treating the endangered and threatened animals kept there. The inadequate care has led to and continues to cause harm, injury, wounding, and harassment to endangered and threatened animals.

38.     For example, in May 2017, a puma named Coco began limping. For two weeks the limp continued to grow worse before Tiger Creek called its attending veterinarian to examine Coco. It was determined that Coco had a fractured leg, but two more weeks went by before he received surgery that ultimately failed. Within the next few months, Coco underwent a second surgery by another veterinarian to fix his leg; however, that surgery was also unsuccessful. Coco's leg was amputated in August 2017. A few months later, Coco started to show signs that his other front leg was injured and by March 2018, Coco could not walk without a limp. By June 2019, Coco would drag his remaining front leg to try to move around his enclosure. Four days elapsed where Coco was predominantly immobile until he was eventually euthanized. Upon information and belief, the cause of Coco's fractured leg was never determined. Thus, Defendants' inadequate veterinary care led to Coco's painful injuries, poor quality of life, and ultimately his death.

39.     On August 20, 2018, Tiger Creek's attending veterinarian euthanized a tiger named Sierra by stabbing Sierra repeatedly with anesthetics directly into her chest. Sierra immediately started twitching and convulsing, but did not die for approximately five minutes in a slow and protracted death.

40.     In December 2019, Nati, a two-year old female tiger, developed a cyst approximately the size of a quarter on her lower abdomen. Defendants refused to provide Nati with timely veterinary care and the cyst continued to grow until it burst open on December 24, 2019. Tiger Creek's attending veterinarian did not attend to Nati in person and advised Defendants to use "hydrotherapy," which consisted of hosing down the affected area with water each day, and prescribed an antibiotic. Over the proceeding weeks, Nati's wound grew to the size of a dinner plate. A veterinarian saw Nati once during this time period, but the veterinarian did not stitch the wound. It was not until January 16, 2020—nearly a month after her cyst burst open—that Nati's wounds were stitched by the veterinarian, and only because the attending veterinarian was already visiting Tiger Creek to observe another animal.

41.     Tiger Creek's attending veterinarian has also blindly prescribed medications and treatment plans for animals over text message without first knowing what species of animal she was treating.

42.     The seventeen tigers, two lions, four bobcats, three pumas, two ring-tailed lemurs and one serval that remain at Tiger Creek are subject to the risk of continued injury, wounding, harm, harassment, and death as a result of Defendants untimely and inadequate veterinary care.

43.     Defendants continue to deny endangered and threatened animals appropriate veterinary care. On April 8, 2021, the United States Department of Agriculture ("USDA") noted in its inspection report a "critical" non-compliance item for Tiger Creek's failure to provide "[a]ccurate and timely communications with a veterinarian" in treating a serval named Dakari, where the USDA inspector "felt the animal should have received veterinary care sooner than [the serval] did." *See* Exhibit B a true and correct copy of the USDA's Inspection with Non-Compliant Items dated April 8, 2021, which is specifically incorporated herein by reference.

44.     In December 2021, the USDA issued a Letter of Official Warning notifying Tiger Creek that the failure to timely communicate with a veterinarian regarding the serval's care constituted an alleged AWA violation. *See* Exhibit C a true and correct copy of the USDA's Official Warning Letter of December 9, 2021, which is specifically incorporated herein by reference. An Official Warning alerts the recipient facility that the USDA "has evidence" the facility committed a violation of the AWA and warns that any further infractions may result in more serious consequences, such as a civil penalty or criminal prosecution.

### Unsafe and Unsanitary Environment

45.     Tiger Creek has failed, and continues to fail, to keep the animals' enclosures free of feces and pests, which places the animals' health and welfare at risk and directly inhibits their ability to engage in normal behavioral patterns.

46.     Inadequate supervision and an understaffed animal care team have caused animals' enclosures to accumulate feces and waste. Lean staffing means enclosures housing endangered and threatened animals go without disinfection for weeks.

47.     Maggots have shown up on some of the animals' food trays. Animals have also suffered from flea infestations.

48.     Visitors have noted that the animals are kept in filthy conditions and the facility reeks of urine. Visitors have also noted animal enclosures are filled with "ashy" feces, which indicates that those feces have been in the enclosure for extended periods.

49.     In August 2021, the USDA found Tiger Creek had failed to remove excessive accumulation of feces, hair, and debris in one of the bobcat enclosures for ten days. *See* Exhibit D a true and correct copy of the USDA's Inspection Report with Non-Compliant Items dated August 24, 2021, which is specifically incorporated herein by reference.

50.     Animals' pools similarly go uncleaned for days, creating unsanitary conditions for the tigers to escape from the over 100-degree summer heat. In August 2021, the USDA also found several pools in Tiger Creek's animal enclosures appeared to be "a very dark greenish color" and posed a health hazard to the animals. *See* Exhibit D.

51.     Defendants have exposed lions, tigers, and ring-tailed lemurs to heightened risk of injury and illness by failing to implement appropriate COVID-19 protocols.

52.     For example, in December 2020 Defendants allowed tiger cub Sitaara to be handled by COVID-19 infected humans without protective equipment or other safety measures to protect her from injury. This occurred despite the fact that all felids—especially cubs who have vulnerable immune systems—are susceptible to SARS-CoV-2, the virus that causes COVID-19 in humans.

53.     Similarly, Defendants have failed to implement protective measures when handling at-risk primates such as ring-tailed lemurs, who have been observed interacting with unmasked employees during the COVID-19 pandemic, despite the risk of virus transmission.

54.     Defendants similarly house endangered and threatened animals in unsafe conditions by failing to supervise employees who pose a danger to the animals. For example, Tiger Creek's former head of animal care doused a young lion named Max with an entire bottle of pure vinegar. The vinegar poured down Max's face and eyes caused Max to scream out. Tiger Creek ultimately did not fire the employee for the incident, and the employee remained head of animal care.

**Inadequate Nutrition Protocols**

55.     Defendants have denied endangered and threatened animals an adequate and appropriate diet, thus interfering with their normal feeding behaviors and resulting in injury and the risk of further injury to endangered or threatened animals.

56.     Defendants have failed to provide food sufficient to meet the species-specific nutritional requirements of the animals. They have also failed to provide food in a safe manner for the animals to avoid injury.

57.     For example, in 2016, Defendants began using donated emu meat that was shipped to Tiger Creek on a flatbed truck that did not have refrigeration. Consequently, the meat was sometimes hot and partially cooked when it arrived. The emu meat was combined with ground beef and when fed to the animals, many of them sorted out the emu meat and left it untouched. This meant that fifteen to twenty big cats had leftover diets for multiple weeks.

58.     When this new diet did not work, Defendants began a fasting schedule for the big cats that stretched out their food portions. On this schedule, Amir—a 475-pound tiger—went from being fed sixteen pounds of food each day for five days a week to sixteen pounds of food *per week*. Upon information and belief, Defendants implemented such diets in order to save money on food purchases.

59.     In 2017, Defendants began feeding big cats Tyson chicken pieces with bones. In March 2017, a lion named Max needed emergency surgery for a stomach blockage attributed to chicken bones. Defendants' practice of feeding chicken to the large felids, such as tigers and lions, increases the risk of their injury. Industry guidelines discourage feeding large felids high percentages of poultry because the resulting diet may be nutritionally imbalanced and can cause serious illness and injury.

60.     Multiple animals have experienced significant health issues from the diet they receive at Tiger Creek, such as blockages, bloody stool, and choking.

### Inadequate Enrichment & Lack of Species-Appropriate Enclosures

61.     Defendants fail to provide adequate shelter that resembles the animals' natural habitats or enrichment that enables the animals to exhibit behaviors they would engage in when in the wild. Captive environments that do not offer large felids, such as lions and tigers, or primates, such as ring-tailed lemurs, the opportunity to engage in natural behaviors have a detrimental effect on the animals' physical and psychological well-being.

62.     General animal husbandry practices require that any exhibitor who chooses to keep captive animals must provide adequate shelter and enrichment that resembles their natural habitat. *See PETA v. Tri-State Zoological Park of W. Maryland, Inc.*, 424 F. Supp. 3d 404, 414 (D. Md. 2019), *aff'd*, 843 F. App'x 493 (4th Cir. 2021). Tiger Creek's barren living conditions harm and harass all of its endangered and threatened animals and amount to "take" under the ESA. *See id.*; see also 16 U.S.C. § 1538(a)(1)(B).

63.     For example, tigers are one of the largest living carnivores and their territories range from 27 to 32 square miles for females and 103 to 114 square miles for males. Tigers are long-ranging species, known to travel over 400 miles to reach tigers in other areas. Tigers are also avid swimmers and can swim up to eighteen miles in a day. Large enclosures with a pool with clean water are *essential for tigers*—they reduce stress and promote naturalistic behavior. The industry group Association of Zoos and Aquariums' ("AZA") Tiger Care Manual—which presents a compilation of knowledge based on the current science, practice, and technology of animal management—says that all tiger exhibits should include relatively large, complex outdoor space.

64.     Lions typically demand similarly complex enclosures to account for their natural behaviors. Lions' home ranges vary by location from 8–17 square miles to over 800 square miles. Lions travel up to 8 miles a day. Lions are very social, with females and cubs living in prides averaging 4–6 adult females, and up to 8 males who hold lifelong alliance with the pride. The AZA manual sets a minimum of 10,000 square feet for lion enclosures.

65.     Given their natural behaviors, captive felids, such as tigers and lions, have particularly high needs for environmental enrichment. It takes effort to formulate enrichment plans for tigers and lions because of their natural behavior needs, as well as their need for large and complex spaces. Because of the complexity of lions' exploring and hunting in the wild, it is difficult to provide fully for this kind of natural behavior within the captive setting.

66.     None of Tiger Creek's enclosures offer the size or complexity necessary to allow the tigers, lions, and other endangered or threatened felids to engage in normal behaviors. Several of the enclosures housing endangered and threatened big cats are barren, with dirt and concrete floors and little activities for the cats to engage with to promote their species-specific behaviors. Enclosures housing some of the animals are so small that big cats housed there cannot run and do not have enough space to play with what little enrichment is provided. Often, staff members are stretched so thin that they do not have the time to provide new enrichment items or adequately rotate existing enrichment, such that the animals come to act as if the enrichment is merely furniture.

67.     During the day, Tiger Creek locks tigers, lions, and other felids out of their covered enclosures in order to ensure the animals are visible to guests. Many of these enclosures have no access to grass and do not adequately protect the animals from the elements. This especially

places the older and other vulnerable animals at health risk, as they are unable to cool off from the grueling Texas summer sun.

68.     Many older animals are housed, out of public view, in older enclosures that are only approximately eight-foot by twenty-foot (8'x20') made out of cinder blocks, chain link fencing, and have red sandy dirt or concrete flooring.

69.     The improper social housing of tigers at Tiger Creek disrupts their normal behavioral patterns and increases the likelihood of, and has caused, injury. Though tigers are normally solitary, Defendants have forced several tigers to live in the same enclosure, causing them to exhibit stress and fear. One integration attempt of two young tigers, a male and a female who may have been related but whom Defendants nevertheless hoped would breed, went so poorly that upon introduction the cats immediately attacked one another. Tiger Creek staff shot the male with a bean bag gun so the female could retreat. The female suffered wounds on her side that left a flap of skin hanging from her body that went untreated by a veterinarian.

70.     Further, the two lions held at Tiger Creek are denied adequate social grouping to account for their natural tendency to live in large groups and prides, which disrupts their normal behavioral patterns and increases the likelihood of injury.

71.     The conditions of confinement, including lack of adequate enrichment, have also caused psychological distress that has been documented in the endangered and threatened animals housed at Tiger Creek. For example, in early 2019, Defendants placed a serval named Zuri on public display. Zuri began to chew on her tail. Despite Zuri's obvious psychological distress, Defendants kept Zuri on display and did not provide appropriate veterinary care to relieve the distress. Zuri eventually bit the tip off her tail.

72.     Similarly, after a golden tabby tiger named Bon was separated from his sibling and placed in an enclosure too small for him, he began to chew on his tail. He had never chewed on his tail before, but it turned into an almost daily occurrence. Bon chewed on his tail so much that he drew blood. Defendants failed to provide Bon with adequate social and physical enrichment, as well as timely and appropriate veterinary care, resulting in his injury.

73.     Defendants similarly deny ring-tailed lemurs an environment supporting their species-typical social interaction and play.

74.     For years, Defendants kept two ring-tailed lemurs, Leonard and Lily, in bird cages devoid of the complex climbing structures, activities, and space required to allow them to engage in their natural and species-specific behaviors.

75.     While displayed in a bird cage in the staff breakroom, Leonard would show stereotypical behavior such as repetitive body movement and aggressive behaviors toward the keepers.

76.     Tiger Creek houses Leonard and Lily alone and without adequate social grouping.

77.     On information and belief, Lily is still housed alone in a bird cage at Tiger Creek, while Leonard is housed in a separate portion of the facility across from a tiger.

78.     Housing ring-tailed lemurs without adequate socialization does not meet the generally-accepted animal husbandry practices in lemur care. Isolating lemurs by depriving them of appropriate socialization and proper housing is extremely harmful and causes these social animals to suffer.

79.     Defendants further deny these lemurs their ability to engage in an array of complex and diverse behaviors known to their species, such as exploration and foraging, by failing to

develop, implement, and/or revise an adequate primate enrichment plan that promotes their psychological well-being.

80.     In 2021, the USDA found Tiger Creek failed to develop a primate enrichment plan for its lemurs, despite acquiring primates as early as 2018. *See* Exhibit B.

### Interstate Transfer of ESA-Protected Animals Without Proper Permits from the Secretary of the Interior

81.     Upon information and belief, Defendants acquired from Doc Antle in Myrtle Beach, South Carolina the tigers Pomfret, Singer, and Nati in December 2018 without an applicable permit issued by the Secretary of the Interior for the acquisition and transfer of endangered and/or threatened species in interstate commerce and thereafter exhibited them.

82.     Defendants also acquired from Doc Antle the tigers Ava, Elouise, and Rosie in July 2019 without an applicable permit issued by the Secretary of the Interior for the acquisition and transfer of endangered and/or threatened species in interstate commerce and thereafter exhibited them.

83.     On information and belief, each of the animals acquired through interstate transfer are or have been exhibited at Tiger Creek.

84.     For example, a black leopard named Bagheera was transported from a facility in Oklahoma owned by Joseph Maldonado-Passage, who is also known as Joe Exotic of the television series "Tiger King." Upon information and belief, Emily Owen personally went to Oklahoma to transport Bagheera back to Tiger Creek.

85.     No permits issued to Tiger Creek, or to any of its many aliases, were found in a recent Freedom of Information Act inquiry into issued transportation permits under the ESA.

86.     Additionally, some of those animals are featured in Tiger Creek materials soliciting donations from the public. The interstate transfer of these big cats thus occurred in commerce.

## VI. <u>CAUSES OF ACTION – VIOLATION OF THE ENDANGERED SPECIES ACT</u>

### COUNT I – UNLAWFUL "TAKE" OF ESA-PROTECTED SPECIES

87. Each and every allegation set forth above is incorporated herein by reference.

88. The Endangered Species Act and its regulations prohibit the "take" of endangered and threatened species within the United States or the territorial sea of the United States without a permit. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.31(a).

89. Defendants have harassed, harmed, wounded, and killed endangered and/or threatened species, including but not limited to tigers, lions, pumas, servals, and lemurs, in violation of the "take" provision of the ESA, and Defendants will continue to violate this provision unless this Court intervenes. 16 U.S.C. §§ 1538–39.

90. Defendants have harmed endangered and/or threatened species in their care by actually killing and/or injuring them.

91. Defendants have intentionally or negligently acted, or failed to act, creating the likelihood of injury to the endangered and/or threatened species in their care, including by annoying them to such an extent as to significantly disrupt normal behavioral patterns.

92. This Court has the authority to issue an injunction prohibiting Defendants from further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award ALDF the costs of litigation, including reasonable attorney and expert witness fees, when appropriate. 16 U.S.C. § 1540(g)(4).

### COUNT II – UNLAWFUL POSSESSION OF ESA-PROTECTED SPECIES

93. The ESA, 16 U.S.C. § 1538(a)(1)(D), prohibits the possession, by any means whatsoever, of any species taken in violation of sections 1538(a)(1)(B) and(C).

94.     Defendants have violated and continue to violate the ESA and its implementing regulations by possessing and continuing to possess unlawfully taken species, including but not limited to tigers, lions, and ring-tailed lemurs, within the meaning of 16 U.S.C. § 1538(a)(1)(D).

95.     This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award ALDF the costs of litigation, including reasonable attorney and expert witness fees, when appropriate. 16 U.S.C. § 1540(g)(4).

### COUNT III – UNLAWFUL TRANSFER OF ESA-PROTECTED SPECIES IN COMMERCE

96.     The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(E), prohibits the delivery, receipt, carry, transport, or shipment "in interstate or foreign commerce, by any means whatsoever and in the course of commercial activity" of any listed endangered or threatened species without a valid permit. The ESA also prohibits the sale or offer for sale of endangered or threatened species in interstate or foreign commerce. 16 U.S.C. § 1538(a)(1)(F).

97.     Defendants have delivered, received, carried, transported, and/or shipped a multitude of endangered and/or threatened species, including but not limited to tigers Pomfret, Singer, Nati, Ava, Elouise, and Rosie, across state lines without the applicable permits in violation of the "transfer" provisions of the ESA. 16 U.S.C. §§ 1538–39.

98.     The acquisition of an animal listed under the ESA for compensated exhibition amounts to "commercial activity."

99.     Defendants' acquisition of endangered and threatened animals from South Carolina and Oklahoma, among other states, for intended exhibition at its Texas facility falls under the definition of interstate "commercial activity." *See* 50 C.F.R § 23.5; *see also Elephant Just.*

*Project v. Woodland Park Zoological Soc'y*, No.C14-0451-5CC, 2015 WL 182201, *3 (W.D. Wash. Apr. 7, 2015).

100. Defendants' economic use of the endangered or threatened animals by exhibiting them for profit eliminates their ability to claim an exception to the permitting requirement for interstate transfer of endangered species under the ESA.

101. Upon information and belief, Defendants have not obtained an applicable permit from the Secretary to transfer, ship, or carry through interstate commerce these endangered and/or threatened species.

102. Defendants' interstate acquisition and transportation of the endangered and/or threatened animals for actual and intended economic use, including their exhibition for profit, without a permit violates the ESA and its implementing regulations. *See* 16 U.S.C. § 1538(a)(1)(E); *see also* 50 C.F.R. § 17.41(c).

103. Defendants will continue to violate the "interstate transfer" provisions of the ESA unless this Court intervenes.

104. This Court has the authority to issue an injunction prohibiting Defendants from further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award ALDF the costs of litigation, including reasonable attorney and expert witness fees, when appropriate. 16 U.S.C. § 1540(g)(4).

## VII. <u>INJUNCTIVE RELIEF</u>

105. Based on the facts set forth in this Complaint, ALDF is entitled to permanent injunctive relief against Defendants because ALDF has demonstrated Defendants' violations of the ESA. ALDF and its members face irrepealable harm, including but not limited to, the

continued harming, harassing, and killing of the endangered and/or threatened species currently held at Tiger Creek, for which monetary relief will not alone be sufficient.

106.    Thus, ALDF requests that its Request for Permanent Injunction be granted and Defendants be enjoined as follows:

- Defendants should be enjoined from violating the Endangered Species Act.

- Defendants should be compelled to turn over all remaining endangered or threatened animals currently housed at Tiger Creek for their immediate transfer to a satisfactory and ESA-compliant wildlife animal sanctuary.

- Defendants should be enjoined from possessing, exhibiting, housing, transferring, or otherwise engaging in activities related to endangered or threatened animals.

## VIII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following relief:

a.      A declaration that Defendants are violating the ESA by illegally taking the endangered and/or threatened species at Tiger Creek;

b.      A declaration that Defendants are violating the ESA by possessing individuals of endangered and/or threatened species who have been illegally taken.

c.      A declaration that Defendants are violating the ESA by illegally transferring the endangered and/or threatened animals at Tiger Creek in interstate commerce and/or commercial activity without a permit;

d.      Enjoin the Defendants from engaging in operations and activities that cause the take of endangered and/or threatened species at Tiger Creek;

e.      Enjoin the Defendants from possessing endangered and/or threatened species that have been illegally taken;

f.      Enjoin the Defendants from acquiring and/or disposing of endangered and/or threatened species in interstate and/or foreign commerce;

g.      Costs and expenses of this lawsuit, including reasonable attorneys' fees incurred by Plaintiff in prosecuting this action; and

h.      Granting Plaintiff such other and further legal and equitable relief against Defendants as the Court deems appropriate.

Dated:  March 15, 2022

Respectfully submitted,

By: */s/ Israel Silvas*
**Israel Silvas**
Texas State Bar No. 24051338
isilvas@dykema.com
**Cliff Riley***
Texas State Bar No. 24094915
criley@dykema.com
**Alexandria Twiss**
Texas State Bar No. 24082511
atwiss@dykema.com
**Tara S. Kern**
Texas State Bar No. 24099283
tkern@dykema.com
**McKenna Rammell Crisp**
Texas State Bar No. 24115255
mrammell@dykema.com
**Erica M. Lux**
Texas State Bar No. 24108911
elux@dykema.com
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone:  (214) 462-6400
Facsimile:  (214)  462-6401

**Maria McIntyre**
Texas State Bar No. 24121003
mmcintyre@dykema.com
**DYKEMA GOSSETT PLLC**
111 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone:  (512) 703-6342
Facsimile:  (512) 703-6399

**Caitlin M. Foley***
Illinois State Bar No. 6323904
cfoley@aldf.org
**ANIMAL LEGAL DEFENSE FUND**
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
Telephone: (707) 795-2533, Ext. 1072

Facsimile: (7070 795-7280

**Daniel H. Waltz\***
District of Columbia Bar No. 1613003
dlutz@aldf.org
**ANIMAL LEGAL DEFENSE FUND**
The Yard, 700 Pennsylvania Ave SE
Washington, DC 20003
Telephone: (707) 795-2533, Ext. 1066
Facsimile: (7070 795-7280

**Ariel Flint\***
New York State Bar No. 5593991
aflint@aldf.org
**ANIMAL LEGAL DEFENSE FUND**
2125 24 Street
Astoria, NY 11105
Telephone: (707) 795-2533, Ext. 1058
Facsimile: (7070 795-7280

**Isabel F. Callejo-Brighton\***
California State Bar No. 333181
icallejo-brighton@aldf.org
**ANIMAL LEGAL DEFENSE FUND**
525 E. Cotati Ave
Cotati, CA 94931
Telephone: (707) 795-2533, Ext. 1078
Facsimile: (7070 795-7280

\*(*pro hac vices forthcoming*)


**ATTORNEYS FOR PLAINTIFF
ANIMAL LEGAL DEFENSE FUND**